UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **CHRISTOPHER ROSE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case number 4:10cv1893 TCM |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Christopher Rose (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

### Procedural History

Plaintiff applied for DIB in January 2009, alleging he was disabled as December 19, 2008, by migraines, left eye vision problems, dizziness, and teeth pain. (R.[1] at 70-128.) His application was denied initially and after a hearing held in December 2009 before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at 7-21, 25-43.) The Appeals

---

[1] References to "R." are to the administrative record filed by the Commissioner with his answer.

Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the administrative hearing.

Plaintiff was 36 years old at the time of the hearing. (<u>Id.</u> at 27.) He has an associate degree from Lincoln University. (<u>Id.</u>)

Plaintiff's work history included jobs with Newcastle Industries, Chrysler, and the Missouri Eastern Correctional Facility. (<u>Id.</u> at 27-28.) The latter was as a correction officer and lasted for eight months; he left then to work for Chrysler. (<u>Id.</u> at 28.) He worked at Chrysler until 2008 when he took a buyout. (<u>Id.</u> at 29.) At the time, he had so many restrictions placed on him about what he could do that Chrysler could not find any work for him. (<u>Id.</u> at 29, 32.) He applied for unemployment after leaving Chrysler. (<u>Id.</u> at 29-30.) Although he represented to the unemployment office that he was ready, willing, and able to work, it was not true. (<u>Id.</u> at 30.) He has not applied for work. (<u>Id.</u>)

Asked what prevents him from working, Plaintiff explained that his condition is worse. (<u>Id.</u> at 31.) He is losing sight in his left eye, has constant migraines and dizzy spells, vomits every day, is constantly having to lie down, and is not able to be on his feet or drive for long. (<u>Id.</u>) He has to lie down in the dark for three or four hours when he has a migraine. (<u>Id.</u> at 33.)

Plaintiff was injured in 2002 and returned to Chrysler with work restrictions. (<u>Id.</u> at 31.) He cannot be around bright lights, fumes, or excessive noise. (<u>Id.</u> at 32.)

Plaintiff has been seeing Dr. Spezia since he was carjacked in 2002. (<u>Id.</u> at 33-34.) He also saw several brain surgeons. (<u>Id.</u> at 34.) In March of 2008 he was informed by the surgeons that they could not tell whether he was healing correctly or if there was still some pressure which needed to be alleviated. (<u>Id.</u>)

## **Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, a consultative examination by a physician, and an assessment by a non-medical consultant of his residual functional capacity.

When applying for DIB, Plaintiff completed a Disability Report. (<u>Id.</u> at 97-104.) He was 6 feet tall and weighed 180 pounds. (<u>Id.</u> at 97.) His impairments included migraines, left eye vision problems, dizziness, and teeth pain. (<u>Id.</u> at 98.) He had been a car jacking victim in 2002 and had to have a metal plate placed in his head. (<u>Id.</u>) Also, his teeth had been knocked out. (<u>Id.</u>) His impairments bother him every day. (<u>Id.</u>) They first caused him pain and other symptoms on December 19, 2008, and caused him to stop working that same day. (<u>Id.</u>) There was no work available at his employer, so he accepted a buyout. (<u>Id.</u>)

Plaintiff also completed a Function Report. (<u>Id.</u> at 105-12.) Asked to describe his daily activities, he reported that he showers, sleeps, naps, walks, takes his medication, and watches television. (<u>Id.</u> at 105.) Every other weekend, he has custody of his son and takes care of him. (<u>Id.</u> at 106.) He also cares for his pet fish, birds, and dogs. (<u>Id.</u>) Before his impairments, he could work a full-time job. (<u>Id.</u>) His impairments prevent him from sleeping

through the night and have caused him to lose his appetite. (Id. at 106, 107.) He prepares meals on a weekly basis; this task takes a couple of hours. (Id. at 107.) He goes outside twice a day. (Id. at 108.) He can go out alone. (Id.) He does not shop very often because it takes a couple of hours. (Id.) His hobbies include watching television., which he does not do often because sitting for long periods of time causes headaches. (Id. at 109.) He talks on the phone or goes out to eat with other people. (Id.) He does not have any problems getting along with others. (Id. at 110.) His impairments adversely affect his abilities to lift, squat, bend, stand, reach, hear, climb stairs, see, remember, concentrate, and follow instructions. (Id. at 110.) They do not affect his abilities to walk, sit, kneel, talk, complete tasks, understand, use his hands, and get along with others. (Id.) He can walk ten minutes before having to rest for twenty. (Id.) He can pay attention for thirty minutes. (Id.) He follows written and spoken instructions well. (Id.)

Using the internet, Plaintiff completed a Disability Report – Appeal form in April 2009 after the initial denial of his applications. (Id. at 119-25.) Since applying for DIB, he was starting to lose his train of thought and was not driving any more; his migraines were worse; he was becoming "very dizzy"; too much light hurt his eyes; too much noise hurt his head; and the vision in his left eye was bad. (Id. at 120.) These changes had occurred on March 31, 2009. (Id.) He has to have people take him places to get medical attention and food and has to be reminded of tasks. (Id. at 123.)

An earnings report listed wages from 1987 to 2008, inclusive. (Id. at 92-93.) His earnings for the last four calendar years averaged $52,688. (Id. at 93.)

The relevant medical records before the ALJ are summarized below and are either from Michael J. Spezia, D.O., or from an emergency room visit.

The earliest record of Dr. Spezia is from January 2007 when Plaintiff consulted him about nausea, diarrhea, pain, and insomnia. (Id. at 166.) Plaintiff next saw Dr. Spezia in July when he needed some paperwork filled out, including restrictions, and prescriptions. (Id. at 189.) Two months later, he wanted the restrictions lifted. (Id. at 188.) His next sixteen visits, from October 15, 2007, to December 3, 2007, inclusive, were for traction therapy after being in a car accident. (Id. at 167-84.)

In January 2008, Plaintiff complained to Dr. Spezia about upper back pain in the left side that had begun two weeks earlier. (Id. at 165.) He was still having stomach problems and loose stools. (Id.) His past medical history included migraines. (Id.)

Plaintiff was taken from the Chrysler plant to the emergency room at St. John's Mercy Medical Center (Mercy) on December 9, 2008, after complaining of a migraine that had begun that morning and of mid-sternal chest pain. (Id. at 133-51.) He told the physician that his work was physical. (Id. at 135.) He denied having any musculoskeletal complaints and had a normal range of motion. (Id. at 138, 139.) A chest x-ray was normal. (Id. at 149.) An electrocardiogram (ECG) was abnormal. (Id. at 151.) He declined a stress test because he had to catch a flight to Detroit and left against medical advice. (Id. at 134, 137.) A computed tomography (CT) scan of his chest performed on January 15, 2009, showed no abnormalities. (Id. at 164.)

Plaintiff next saw Dr. Spezia on March 3. (Id. at 157.) The office note refers to the visit as a follow-up. (Id.) Also, Plaintiff was having migraines and stomach problems. (Id.) The same day, Dr. Spezia answered a questionnaire asking for Plaintiff's diagnosis and for a description of any work-related functional limitations. (Id. at 156.) The diagnoses were migraines, dizziness, blurred vision in his left eye, and status post insertion of a plate in his skull in 2002. (Id.) He had no restrictions according to the examination of that same day. (Id.)

Plaintiff returned to Dr. Spezia in October 2009 for a complete examination and bloodwork. (Id. at 204-207.) His complaint was of migraines. (Id. at 204.)

Also before the ALJ was the March 2009 report of a consultative examination of Plaintiff by Inna Park, M.D. (Id. at 192-97.) Dr. Park summarized Plaintiff complaints as follows.

> 1. Posttraumatic migraine headaches. Claimant was the victim of a car jacking and suffered a left temporal skull fracture and had all of his bottom teeth broken. He states that immediately postoperatively he noted headaches on [sic] the left temple. He complains of a throbbing pain in the left temple with blurriness of the left eye and drooping of the eyelid. It is associated with numbness and tingling along the left side of his face and vertigo. He states these occur every other day and last anywhere from 45 minutes to 2 hours. They are precipitated by bright lights, strong odors, or loud noises. He states that Imitrex if it will work works within 30 minutes, sometimes he needs to take Ibuprofen, and 50% of the time the medications do help him. He states that also a quiet dark room with a cold pack and lying down will also help. He has never tried prophylactic medications.
>
> 2. Tooth pain. The claimant states that since having all of his bottom teeth lost he has fake teeth now, which hurt when he eats hard items or apples, or if he eats anything cold. He states that it occurs about once a week and he uses Ibuprofen to relieve the pain.

(Id. at 192.) Plaintiff was described as being "a cooperative, comfortable male who is alert and has excellent knowledge of his medical condition, good hygiene, normal build and normal endurance. Speech, hearing and affect are normal." (Id. at 193.) On examination, he had no palpable tenderness in his cervical, thoracic, or lumbar spine. (Id.) There was no muscular tenderness or spasms noted. (Id. at 193-94.) He had a normal range of motion in his shoulders, elbows, wrists, knees, hips, ankles, and lumbar and cervical spine and no evidence of muscular atrophy. (Id. at 194, 196-97.) Without assistance, he was able to get on and off the exam table and to sit up from a lying position. (Id. at 194.) He did not use an assistive device, and was able to toe and heel walk without difficulty and to squat to the floor and recover independently and without complaint. (Id.) His gait and station were normal. (Id.) His grip strength was normal. (Id. at 196.) Straight leg raises were negative.[2] (Id. at 197.) His vision was 20/20 in each eye both when corrected and when not. (Id. at 195.) The impression was of "[p]osttraumatic migrainous headaches" and "[i]ntermittent pain of the teeth." (Id. at 194.)

Two weeks later, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by an agency non-medical consultant. (Id. at 198-203.) The only diagnosis was migraines. (Id. at 198.) There were no exertional, manipulative, visual, or communicative limitations. (Id. at 199-201.) There was one postural limitation, i.e., Plaintiff

---

[2]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

should avoid balancing, and one environmental limitation, i.e., Plaintiff should avoid concentrated exposure to hazards. (Id.)

In November 2009, the month after Plaintiff's last visit to Dr. Spezia, Dr. Spezia completed a "Headaches Residual Functional Capacity Questionnaire." (Id. at 208-213.) Plaintiff's headaches were associated with vertigo, photosensitivity, visual disturbances, and mental confusion/inability to concentrate. (Id. at 209.) They occurred weekly and lasted for hours. (Id.) They were triggered by alcohol, lack of sleep, and stress. (Id.) They were made worse by bright lights, moving around, and noise and made better by Plaintiff lying in a dark room. (Id. at 209-10.) Cervical disc disease, history of head injury, migraines, and sinusitis could "reasonably be expected" to cause the headaches. (Id. at 210.) "[E]motional factors" "somewhat" contributed to his headaches. (Id.) The headaches would generally preclude Plaintiff "from performing even basic work activities" and would require him to have a break from the workplace. (Id. at 211.) He would sometimes need to take unscheduled breaks during an eight-hour workday. (Id. at 212.) Although how often this would happen was unknown, when it did he would need to rest for one to two days before returning to work. (Id.) He was capable of low stress jobs, but his headaches would produce "good days" and "bad days." (Id.) He would have to be absent from work approximately twice a month. (Id.)

## **The ALJ's Decision**

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ first found that Plaintiff had not been engaged in substantial gainful activity since his alleged onset date of December 19, 2008. (Id. at 10-12.)

The ALJ next found that Plaintiff had a severe impairment of post-traumatic migraine headaches. (Id. at 12.) He did not find Plaintiff's alleged impairments of left-sided vision problems, dizziness, and tooth pain to be severe. (Id.) Specifically, the only medical record referencing Plaintiff's vision problems was that of Dr. Park's examination. (Id.) The only time Plaintiff had tooth pain was when he ate hard or cold food. (Id.) There was no objective medical evidence to support his claims of dizziness. (Id.) Although Dr. Spezia noted that Plaintiff had vertigo, the evidence as a whole did not support this statement. (Id. at 12-13.) Plaintiff had had only episode of chest pain. (Id. at 13.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.)

Plaintiff did have the residual functional capacity (RFC) to perform a full range of medium work.³ (Id.) In reaching this conclusion, the ALJ reviewed Plaintiff's testimony and the other evidence of record. (Id. at 14-19.) Addressing Plaintiff's diabetes, the ALJ noted that Plaintiff had sustained the injuries to his head and teeth when he was the victim of a carjacking in 2002 but had reported that his condition had first interfered with his ability to work on December 19, 2008. (Id. at 14.) He returned to work on that day after being taken to the emergency room on December 9 and there was no work available; he then took a buyout in the approximate amount of $145,831. (Id.) He reported that he took care of his son every other weekend and of pets. (Id.) He had no problems with personal care tasks, was

---

³Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds." 20 C.F.R. § 404.1567(c). If someone can do medium work, he can do sedentary or light work. Id.

able to go out unaccompanied, and could shop for a couple of hours. (Id.) The ALJ noted that Plaintiff had refused a stress test when at the emergency room. (Id. at 15.) After summarizing the medical records of Dr. Spezia and the report of Dr. Park, the ALJ noted that Plaintiff had been seen by Dr. Spezia only three times after his alleged onset date and that there were no records from any brain surgeons regardless of Plaintiff's testimony that the surgeons wanted him to undergo further surgery. (Id. at 15-18.) The ALJ further noted that Dr. Spezia's notes were generally illegible, although they did include references to Plaintiff being prescribed medication. (Id. at 16, 17.) Moreover, Plaintiff had been seen more often in 2007 than in any year since and had worked for many years with his impairments. (Id. at 18.) He also had taken a buyout on his alleged disability onset date and had thereafter applied for unemployment benefits. (Id. at 19.)

With his RFC, however, Plaintiff could not perform any past relevant work. (Id.) Applying the Medical-Vocational Guidelines, Plaintiff could, with his RFC, age, and education, perform other work that existed in significant numbers in the national economy and was not disabled within the meaning of the Act. (Id. at 19-20.)

**Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous

work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This requires that the ALJ consider

> "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."

**Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

> "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."

**Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (quoting Beckley, 152 F.3d at 1059).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Rather, "'[i]f, after reviewing

the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) failing to base his RFC findings on at least some medical evidence and (2) relying on the Medical-Vocational Guidelines. The Commissioner disagrees.

"'The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC.'" **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). "'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" **Id.** (quoting Vossen, 612 F.3d at 1016).

Plaintiff focuses his challenge to the ALJ's RFC findings on the weight given to the headaches questionnaire of his treating physician, Dr. Spezia. Specifically, he contends that the questionnaire contains "significant and legible restrictions" that were improperly not included in the RFC. (Pl. Mem. at 8.)

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

Title 20 C.F.R. § 404.1527(d) lists six factors to be evaluated when weighing opinions of treating physicians:  (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6). Consideration of these factors supports the ALJ's decision not to give greater weight to Dr. Spezia's questionnaire responses.

Plaintiff testified that he had been treated for his head injury by brain surgeons and had seen one as recently as March 2008. On the other hand, the majority of his visits to Dr.

Spezia were, as noted by the ALJ, in 2007, the year before his alleged disability onset date, and were related to injuries he had sustained in a car accident. In his first visit to Dr. Spezia after the alleged disability onset date, Plaintiff complained of migraine and stomach problems and was diagnosed with migraines, dizziness, and blurred vision in his left eye. Dr. Spezia noted that he did not have any restrictions. Additionally, a consultative examination the same month revealed that he had 20/20 vision in each eye, was able to walk with a normal gait and station and without any assistive device, and had a normal range of motion. Plaintiff next saw Dr. Spezia seven months later. It was the following month, after having seen Plaintiff only twice after his alleged disability onset date, that Dr. Spezia completed the questionnaire at issue. The restrictions cited by Plaintiff, i.e., the need to take unscheduled breaks, were indicated by use of checkmarks on the questionnaire.

It is permissible for an ALJ to discount an assessment of a treating physician that consists of conclusory statements. See **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See also **Martise**, 641 F.3d at 926 (affirming ALJ's decision to give treating physician's medical source statement less weight when such was unsupported by medical evidence, including his own treatment notes, and consisted of checkmarks); **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes). Moreover, the checkmarks indicating the symptoms of Plaintiff's migraines and their resulting limitations were clearly made based on Plaintiff's reports and not on any independent findings of Dr. Spezia. As discussed below, the ALJ properly found Plaintiff's description of his limitations to not be

credible. See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (rejecting argument that ALJ erred in assessing claimant's impairments when medical opinion cited by claimant was "largely based" on her own statements); accord **Wildman**, 596 F.3d at 967; **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007).

As noted above, the ALJ evaluated Plaintiff's credibility when assessing his RFC. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  In the instant case, the ALJ properly considered the minimal medical treatment Plaintiff sought for his allegedly disabling impairments, see **Hepp v. Astrue**, 511 F.3d 798, 803 (8th Cir. 2008); **Wagner**, 499 F.3d at 851, his continuing to work for six years with those impairments and without any evidence of his condition worsening, see **Martise**, 641 F.3d at 924 (affirming denial of benefits to claimant alleging disabling migraine headaches when claimant had worked for several years with headaches and there was no medical evidence that headaches had worsened); **Goff**, 421 F.3d at 792-93 (finding that when evaluating the claimant's credibility the ALJ properly considered the fact that the claimant worked with his allegedly disabling impairments for three years and had no evidence of any deterioration), his receipt of unemployment benefits after his alleged disability onset date, see **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998), and his ability to care for his son and various pets, shop, and socialize, see **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011).[4]

---

[4]The Court notes that although Plaintiff's unbroken earnings record weighs in favor of his credibility, "it [is] for the ALJ to weight all the evidence and make a credibility finding." **Finch**, 547 F.3d at 936.

Plaintiff further argues, however, that the ALJ erred by not contacting Dr. Spezia after finding his treatment notes to be illegible.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." **Ellis**, 392 F.3d at 994. "The ALJ does not 'have to seek additional clarifying statements from a treating physician[, however,] unless a *crucial issue* is undeveloped.'" **Vossen**, 612 F.3d at 1016 (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). A crucial issue was not undeveloped in the instant case; rather, it was resolved unfavorably to Plaintiff. See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons**, 497 F.3d at 819 (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

In his next, and final argument, Plaintiff contends that the ALJ erred by relying on the Medical-Vocational Guidelines because he has significant nonexertional impairments. Specifically, he has vertigo, photosensitivity, visual disturbance, and mental confusion. (Pl. Mem. at 12.) The Guidelines may be used if a nonexertional impairment "do[es] not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities." **Baker v. Barnhart**, 457 F.3d 882, 894 (8th Cir. 2006) (internal quotations omitted). "In particular, [w]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden

[at the fifth step] may be met by use of the [Medical-Vocational Guidelines]." **Id.** (internal quotations omitted) (all but second alteration in original).  The four cited limitations are indicated by checkmarks in the questionnaire completed by Dr. Spezia.  For the reasons set forth above, those limitations were found by the ALJ not to be significant.  Consequently, he did not err in using the Medical-Vocational Guidelines.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this  30th  day of November, 2011.